## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **IN RE: ETHYLENE PROPYLENE DIENE MONOMER (EPDM) ANTITRUST LITIGATION** | CIVIL ACTION NO. 3:03md1542 (SRU) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |
| **IN RE: POLYCHLOROPRENE RUBBER (CR) ANTITRUST LITIGATION** | CIVIL ACTION NO. 3:05md1642 (SRU) |
| THIS DOCUMENT RELATES TO ALL ACTIONS | |

### RULING ON MOTIONS TO STRIKE and FOR SUMMARY JUDGMENT

This multidistrict litigation arises out of allegations that the defendants conspired to fix, raise, maintain, and stabilize the price of ethylene propylene diene monomer ("EPDM") synthetic rubber at artificially high, noncompetitive levels in violation of federal antitrust law.  The remaining defendants, DSM Copolymer, Inc. ("DCI") and DSM Elastomers Europe B.V. ("DEE") (collectively, the "DSM defendants"),[1] move for summary judgment on all claims of the class plaintiffs in the *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litigation* (the "EPDM antitrust litigation"), Case No. 3:03md1542(SRU),[2] and all of the claims of the

---

[1] When referring collectively to the group of original defendants in both MDLs, I will use the generic "defendants."

[2] On February 13, 2009, I granted the class plaintiffs' motion for class certification.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82 (D. Conn. 2009).

remaining individual plaintiffs in the *In re Polychloroprene Rubber (CR) Antitrust Litigation* (the

"CR antitrust litigation"), Case No. 3:05md1642(SRU).[3]  The DSM defendants have additionally

moved to strike several key pieces evidence in both cases, asserting that the evidence would be

inadmissible at trial and, therefore, should not be considered for purposes of deciding their

motion for summary judgment.

     For the reasons explained more fully below, the motions to strike are denied in their

entirety.  In addition, because the plaintiffs have presented sufficient evidence from which a

reasonable jury could conclude that the DSM defendants were engaged in an illegal price-fixing

conspiracy in the U.S. EPDM market, the motions for summary judgment are denied.

     I will first address the motions to strike.

## I.    Factual Background[4]

     EPDM is a synthetic rubber used primarily in the automotive and roofing industries; it is

found in products such as weather stripping and seals, radiator, garden and application hoses,

automotive belts, electrical insulation, roofing, and some tire applications.  Between January 1,

1997 and December 31, 2001 – the Class Period – U.S. production of EPDM fluctuated between

a low of 347,000 metric tons to a peak of 397,000 metric tons.  During Class Period, the five

---

[3] The CR antitrust litigation involved antitrust conspiracy allegations relating to the markets of three different synthetic rubbers: EPDM, CR, and acrylonitrile-butadiene ("NBR"). The antitrust claims against the DSM defendants in the CR antitrust litigation relate solely to the EPDM market and are identical to the class plaintiffs' claims against the DSM defendants.  The DSM defendants moved for summary judgment and to strike in both antitrust litigations, raising the same arguments and objections to the same evidence.  Accordingly, this ruling is applicable to the claims in both multidistrict antitrust litigations.

[4] The facts presented here are drawn from the parties' Local Rule 56(a)1 and Local Rule 56(a)2 Statements filed in conjunction with the memoranda in support of and in opposition to the motions for summary judgment.  Unless otherwise noted, the facts are undisputed.

largest North American producers of EPDM were DCI; Crompton Corporation (f/k/a Uniroyal Chemical Corporation) ("Crompton"); DuPont Dow Elastomers ("DDE"), a joint venture of the Dow Chemical Company and E.I. DuPont de Nemours & Company; Bayer Polymers; and ExxonMobil Corporation ("Exxon").  Because of the small number of producers, the U.S. market for EPDM is considered "concentrated."  It is undisputed that, during the relevant period, there were six "lockstep," industry-wide list price increases.

In the first half of this decade, criminal investigations into an alleged price-fixing conspiracy in the EPDM industry were commenced by the United States Department of Justice ("DOJ"), the Canadian Competition Bureau ("CCB"), and the European Commission ("EC"). All three entities closed their EPDM investigations in 2006 without bringing any criminal charges against any company or individual.[5]

In April 2003, shortly after the public announcement of the DOJ investigation, putative class action suits alleging price fixing in violation of section 1 of the Sherman Act were filed by direct purchasers of EPDM.  The defendants in those suits included the DSM defendants, DCI and DEE; Crompton; DDE; Bayer Polymers, Bayer Corporation, Bayer AG (collectively, "Bayer"); Exxon; and Polimeri Europa S.p.A. (f/k/a Enichem S.p.A) ("Polimeri/Syndial").  In 2004, Goodyear Tire & Rubber Company filed an action, and Parker Hannifin Corporation ("Parker Hannifin") and PolyOne Corporation ("PolyOne") filed their own action against all the same defendants, with the exception of Exxon.  The class actions and the Goodyear and Parker

_____

[5] Criminal charges, however, were brought against the named defendants – with the exception of the DSM defendants – for price-fixing in the CR and NBR industries.  Those corporations pled guilty to criminal charges in the United States and/or Canada, paying large fines for their role in price-fixing conspiracies in those other synthetic rubber markets.

Hannifin/Polyone suits were consolidated for pretrial proceedings in this court in two separate, but coordinated, MDL-proceedings: the EPDM antitrust litigation and the CR antitrust litigation.

The plaintiffs have alleged that the defendants conspired to fix, maintain, and/or stabilize EPDM prices in the United States in violation section 1 of the Sherman Act, 15 U.S.C § 1, by engaging in collusive discussions, meetings, agreements, and understandings to raise prices to supracompetitive levels and to stabilize the supply of EPDM from competitors outside the cartel. The plaintiffs allege that the defendants met regularly to discuss EPDM prices – at trade association meetings or at other off-site locations – and engaged in regular written communications with one another to maintain their collusive agreement.  The plaintiffs contend that, pursuant to their collusive agreements, the defendants took turns leading EPDM price increases by conferring months in advance of an announced price increase about whose turn it was to raise prices.

The plaintiffs also allege that defendants sought to cut off new sources of capacity by buying up new production in Asia and eventually setting up market allocation agreements between North American suppliers and those Asian suppliers.  The plaintiffs allege the global conspiracy was most effective in the U.S. and Canadian markets, where prices were approximately 10-15% higher than in the Western Europe market.

The plaintiffs allege that the defendants were so protective of their cartel that when a defendant's production capacity dropped due to plant or production problems, its competitors would provide that defendant with EPDM so that it could continue to supply its customers, rather than take the opportunity to compete for those customers directly.  In return for receiving the additional supply of EPDM, the plaintiffs allege the struggling supplier would agree not to

-4-

compete for the supplying party's customers.  Thus, despite individual supplier disruptions, set market share and customer allocations were maintained.

The DSM defendants have moved for summary judgment on the ground that the plaintiffs have failed to establish any evidence supporting their allegations that the DSM defendants agreed with the other defendants to engage in an illegal price-fixing conspiracy in the United States between January 1, 1997 and December 31, 2001.

## II.     Motion to Strike

The DSM defendants have moved to strike much of the evidence that the plaintiffs rely on to establish a genuine issue of material fact that the DSM defendants were engaged in an illegal conspiracy in violation of section one of the Sherman Act.  The DSM defendants argue that each piece of contested evidence would be, for varying reasons, inadmissible at trial.  I will separately address the admissibility of each piece of evidence.

### A.     Standard of Review

A motion to strike is the appropriate means for challenging evidence submitted in connection with a motion for summary judgment.  *Newport Elec., Inc. v. Newport Corp.*, 157 F. Supp. 2d 202, 208 (D. Conn. 2001).  Typically, motions to strike are granted where the evidence would not be admissible at trial.  *See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) ("[E]vidence considered on summary judgment must generally be admissible evidence.").   "Even on summary judgment, a district court has wide discretion in determining which evidence is admissible . . . ."  *Id.* (internal quotation omitted).

1.     *Crompton Interrogatory Answers*

The DSM defendants first move to strike the Crompton (n/k/a Chemtura Corporation) interrogatory responses dated June 20, 2006.  Jt. Ex. 94.  The interrogatory answers provide what is essentially an overarching timeline of the contact that Crompton executives had with various executives from other EPDM producers, including the DSM defendants, prior to, during, and after the Class Period.  The interrogatory answers describe the meetings that took place between the executives of the various EPDM producers, and relate what was discussed and agreed to at those meetings.  The key Crompton executives who engaged in the underlying conduct described in the interrogatory response – Joe Gatto (Jt. Ex. 103); Daniel Shantz (Jt. Ex. 109); Gerald Fickenscher (Jt. Ex. 111); and James Conway (Jt. Ex. 167) – invoked their Fifth Amendment privilege against self-incrimination at their depositions.[6]  Therefore, those executives are unavailable to testify directly about the events described in the interrogatory answers.[7]

_____

[6] A fifth Crompton executive, Bernard Schmitt, actually testified at his deposition, but had failed recollections concerning most of the key events.  *See* PD 11, Schmitt Dep.

[7] The validity of the executives' assertion of the Fifth Amendment privilege has not been challenged in this case, even though any testimony at trial would likely occur after the relevant statutes of limitations had expired.  *See, e.g.*, 18 U.S.C. § 3282(a) (imposing five-year statute of limitations for criminal prosecutions from date of offense).  I therefore assume that the EPDM executives properly invoked the privilege against self-incrimination at their depositions.

At trial, however, the Court will have to "determine, in view of the implications of the question, in the setting in which it is asked, whether the incriminating nature of the [witnesses'] answer[s are] evident."  *United States v. Edgerton*, 734 F.2d 913, 919 (2d Cir. 1984).  The applicable statute of limitations for criminal prosecutions is a potentially decisive consideration for evaluating whether witnesses' statements are privileged under the Fifth Amendment. *Compare In re High Fructose Corn Syrup Antitrust Litig.*, 293 F. Supp. 2d 854, 859-61 (C.D. Ill. 2003) (holding that witnesses could not invoke Fifth Amendment privilege because prosecution of witnesses for antitrust violations was "clearly barred by the statute of limitations"), *with ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse*, 110 F.R.D. 278, 282-83 (S.D.N.Y. 1986) (holding that statements were privileged because "it cannot be concluded with certainty that all relevant statute of limitations have run").

Both sides agree that the interrogatory answers are inadmissible as hearsay.  The plaintiffs

further agree that the interrogatory answers of one defendant are not admissible against another

defendant, unless those answers are covered by an exception to the hearsay rule.  *Accord* 8A

Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Federal Practice and Procedure §

2180 (2d ed. 1994).  The plaintiffs contend, however, that there are two exceptions to the hearsay

rule that would permit the admission of the Crompton interrogatory answers at trial: Federal Rule

of Evidence 804(b)(3), which governs statements made by unavailable witnesses, and Federal

Rule of Evidence 807, the catch-all hearsay exception.

Rule 804(b)(3) provides that the hearsay rule does not exclude certain statements where

(1) the declarant is unavailable, and (2) the statement, at the time it was made, was:

> so far contrary to the declarant's pecuniary or proprietary interest, or so far
> tended to subject the declarant to civil or criminal liability, or to render
> invalid a claim by the declarant against another, that a reasonable person in
> the declarant's position would not have made the statement unless believing
> it to be true.

Witnesses who invoke their Fifth Amendment privilege against self-incrimination are

"unavailable" within the meaning of Rule 804(b).  *United States v. Jackson*, 335 F.3d 170, 177

(2d Cir. 2003).  According to the plaintiffs, because the Crompton executives who are the subject

of the interrogatory answers have invoked the Fifth Amendment, and thus will not be available to

testify about the incidents related in the interrogatory answers, those executives will be

"unavailable" as witnesses pursuant to Rule 804(b)(3).

The DSM defendants challenge that Crompton will be "unavailable" at trial, regardless of

the unavailability of certain of its executives, contending that a corporation cannot be considered

"unavailable" for purposes of the hearsay exception when its executives invoke the Fifth

Amendment.  The DSM defendants further note that the Crompton corporate representative who signed the interrogatory answers did not have personal knowledge of the information contained therein, but rather certified those answers "to the best of [his] information, knowledge, and belief" based on the information made available to him by others.  Jt. Ex. 166.  Therefore, he would be unable to testify about the events described in the interrogatory answers.

Corporations do not have a Fifth Amendment privilege against self-incrimination. *Consol. Edison Co. of N.Y. v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002) (citing *Wilson v. United States*, 221 U.S. 361, 382-86 (1911)).  Accordingly, Crompton – the entity responding to the interrogatory requests – is not "unavailable" within the meaning of Rule 804(b)(3).  It is an open question whether a corporation could become "unavailable" if all its corporate representatives who are the source for the information contained in the corporation's "statement," are unavailable.  Because I believe Rule 807 provides for the interrogatory answers' admission into evidence, however, I need not reach that issue.

Turning to the plaintiffs' second hearsay exception, the hearsay rule will not exclude statements that are not covered under the other hearsay exceptions, but that nevertheless have the "equivalent circumstantial guarantees of trustworthiness."  Fed. R. Evid. 807.  "To be admissible under Rule 807, the evidence must be (1) trustworthy, (2) material, (3) more probative than other available evidence, and must fulfill (4) the interests of justice and (5) notice."  *Silverstein v. Chase*, 260 F.3d 142, 149 (2d Cir. 2001).  The residual exception should be applied only in "the rarest of cases."  *United States v. Harwood*, 998 F.2d 91, 98 (2d Cir. 1993) (internal quotation omitted).

There is no dispute that the DSM defendants are on notice with regard to the plaintiffs'

intentions to use the interrogatory answers as a significant part of their antitrust case against the DSM defendants.  In addition, there is no question that the interrogatory answers are material to the plaintiffs' case – in the absence of the interrogatory answers, the only available evidence about the events at issue are the statements of DSM executives who cannot recall what occurred during those meetings or who deny the version of events described in the interrogatory answers. Therefore, the interrogatory answers would be significant, and perhaps necessary, in creating a genuine issue of material fact on the issue of the DSM defendants' liability for knowing participation in a price-fixing conspiracy.

Finally, the answers are certainly more probative than other available evidence because they constitute the only documentary evidence available to the plaintiffs that disputes the DSM defendants' version of what occurred at certain specific and verifiable events.  For instance, for many of the pertinent events comprising the alleged price-fixing scheme, although the plaintiffs have admissible evidence placing a DSM executive at a particular location on a particular day, they have no additional evidence of what occurred at that meeting to dispute the DSM defendants' recollection of what occurred.  For example, the interrogatory answers admit that, on October 20, 1999, a Crompton executive met with a DSM executive at a Baton Rouge, Louisiana coffee shop, and that they "discussed North American pricing."  Jt. Ex. 94 at 28.  The interrogatory answers suggest that the DSM representative, Roger Lacallade, stated that "DSM would not lead a price increase because they had led one in the past and had suffered as a result." *Id.*  When asked about that specific meeting, the Crompton executive, Daniel Shantz, invoked the Fifth Amendment and refused to discuss that meeting during his deposition.  Jt. Ex. 109, Shantz Dep. at 86-87.  In contrast, Lacallade admitted to meeting Shantz at the coffee shop but could not

recall what they discussed.  PD 10, Lacallade Dep. at 98-99.

The disagreement between the parties boils down to the issue of the evidence's trustworthiness.  The DSM defendants vigorously dispute the interrogatory answers' trustworthiness, arguing that because Crompton had tried and failed to settle with the plaintiffs but ultimately did reach a settlement, it had an incentive to shift the blame to other defendants in order to negotiate a smaller settlement amount.  The plaintiffs counter that the interrogatory answers are trustworthy because they were made while Crompton was still an active defendant in these antitrust litigations and the answers exposed Crompton to liability as a participant in the conspiracy and to treble damages under the Sherman Act.  Thus, the statements were made despite being against the pecuniary interest of the company.

I conclude that the totality of the circumstances surrounding the production of the interrogatory answers supports their trustworthiness.  First, they were made while Crompton remained a defendant in this action.  The interrogatory answers were submitted on June 21, 2006, Jt. Ex. 94 at 45, and verified on August 29, 2006, Jt. Ex. 166.  The parties did not settle until February 2007; the plaintiffs submitted a stipulation of dismissal of all claims, with prejudice, against Crompton (doc. #330), and I granted the plaintiffs' motion for approval of the proposed settlement agreement with Crompton on February 15, 2007 (doc. #334).  Interrogatory answers are treated as judicial admissions, which can be used against a party in the course of litigation, meaning that interrogatories must be answered with a special degree of care.  *Guadagno v. Wallack Adler Levithan Assocs.*, 950 F. Supp. 1258, 1261 (S.D.N.Y. 1997).  Accordingly, at the time the answers were verified by the appropriate corporate representative, Crompton remained subject to liability – and to the possibility of treble damages – on the basis of their answers to

-10-

those interrogatories.

Second, it is not clear that the interrogatory answers furthered Crompton's self-interest in settlement negotiations. The defendants argue that the interrogatory answers are not trustworthy because Crompton had a motive to shift the blame to its co-defendants in the hopes of negotiating a better settlement agreement in the future. But that explanation is not clear from the face of the answers and, furthermore, the converse could also be true. The interrogatory responses contain enough circumstantial evidence to permit a reasonable fact-finder to conclude that Crompton and its representatives participated in an EPDM antitrust conspiracy that exposed it to criminal and civil liability. Because conspiracy involves joint activity, implicating one's co-defendants does not necessarily relieve or lessen one's own liability. Therefore, even if the answers did not contain an explicit admission that Crompton participated in the conspiracy, they strengthened the plaintiff's antitrust case most decisively against Crompton. The interrogatory answers gave the plaintiffs reason *not* to settle with Crompton in the hopes of receiving treble damages at trial, which makes them more reliable than the defendants contend.

The DSM defendants point to *Kirk v. Raymark Industries, Inc.*, 61 F.3d 147, 167-68 (3d Cir. 1995), which held the district court abused its discretion by admitting a settling defendant's interrogatory answers against a non-settling defendant under the residual exception because the answers were self-serving and disclaimed the liability of the settling defendant. *Raymark* is distinguishable, however, precisely because Crompton's interrogatory answers are inculpatory, not exculpatory. In *Raymark*, the settling defendant sought to disclaim liability and "had every incentive to set forth the facts in the light most favorable to itself." *Id.* at 167. The plaintiff sought to prove that the non-settling defendant's product had been solely responsible for his

-11-

asbestos exposure by relying on the settling defendant's interrogatory response that *its* product did not emit meaningful levels of asbestos dust and fibers, thereby leaving only the non-settling defendant's product to blame. *Id.* at 166. The Third Circuit held that such a "self-serving" answer by the settling defendant, which was motivated to avoid liability at the time the interrogatory responses were submitted, "lacks the 'circumstantial guarantees of trustworthiness'" contemplated by the residual exception to the hearsay rule. *Id.* at 167 (quoting Rule 807's predecessor, Rule 803(24)). Unlike the settling defendant in *Raymark*, Crompton's interrogatory answers did not reduce, but enhanced, its exposure to liability, making those answers inherently trustworthy.

Finally, the unusual circumstances presented here warrant the rare application of Rule 807 and supports the final factor, i.e., that its application be in the interests of justice. Crompton, as a corporation, is not permitted "to take the Fifth" and render itself unavailable for purposes of Rule 804. Nevertheless, the individuals at Crompton with personal knowledge of the events that formed the basis of the corporation's interrogatory responses have chosen to exercise their Fifth Amendment privilege against self-incrimination, effectively rendering Crompton unavailable to testify at trial about those events. If Crompton were an individual who had submitted those interrogatory responses and then, when called to take the stand to testify, had taken the Fifth, the interrogatory answers would have been admitted as a matter of course under recognized exceptions to the hearsay rule. Because Crompton is a corporation, however, it must speak through its representatives. When those representatives invoke the Fifth Amendment, however, Crompton is rendered effectively speechless on those issues, yet still remains technically "available" to testify.

The interrogatory answers have an equivalent circumstantial guarantee of trustworthiness to other out-of-court statements excepted from the hearsay rule, and are admissible under Rule 807.  Accordingly, the DSM defendants' motion to strike those answers from consideration of its motion for summary judgment is denied.  The DSM defendants are, of course, still permitted to dispute the relevance and credibility of those statements at trial.

2.      *Invocation of Fifth Amendment Privilege by Crompton Executives*

The DSM defendants next seek to prevent the plaintiffs from drawing an adverse inference against the DSM defendants from the Crompton executives' invocations of their Fifth Amendment privilege.

The Second Circuit does not preclude drawing an adverse inference against an opposing party from a non-party witness's invocation of the Fifth Amendment privilege against self-incrimination.  In *LiButti v. United States*, 107 F.3d 110, 123-24 (2d Cir. 1997), the Second Circuit set forth four non-exclusive factors a trial court should consider when determining the admissibility of a non-party's invocation of the Fifth Amendment: (1) the nature of the relevant relationships; (2) the degree of control of the party over the non-party witness; (3) the compatibility of the interests of the party and non-party witness in the outcome of the litigation; and (4) the role of the non-party witness in the litigation.  Ultimately, the "overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth."  *Id.* at 124.

The first factor – the nature of the relationship – is the most significant for determining admissibility.  *Id.* at 123.  When the party and the non-party witness are claimed co-conspirators, generally courts have required there to be sufficient, independent proof of a conspiracy between

them before permitting the jury to draw an adverse inference against the party.  *See, e.g.*, Jury

Instructions, *In re Scrap Metal Antitrust Litig.*, No. 1:02cv844 (N.D. Ohio 2006) (doc. # 631)

(instructing jury that it could draw a "negative inference" against defendant from non-party

witnesses' invocation of the Fifth Amendment privilege if, and only if, "there is independent . . .

evidence to support the conclusion that such defendant participated in a conspiracy with the

particular witness or with the particular corporation with which that witness was affiliated");

*State Farm Mut. Auto. Ins. Co. v. Abrams*, No. 96-C-6365, 2000 WL 574466, at *7 (N.D. Ill.

May 11, 2000) (agreeing that an adverse inference may be drawn against a party from an alleged

co-conspirator's invocation of the Fifth Amendment, but concluding that the court need not

decide the issue on a motion for summary judgment because there was enough additional

evidence of the conspiracy to create a genuine issue of material fact); *United States v. Dist.

Council of N.Y. City & Vicinity of the United Bhd. of Carpenters & Joiners of Am.*, 832 F. Supp.

644, 652 (S.D.N.Y. 1993) (agreeing that "the refusal to testify by a proven co-conspirator may

justify an adverse inference against the other co-conspirators," but concluding that whether the

proof of the conspiracy at trial "support[ed] the inference remain[ed] to be seen").

     Because, as discussed more fully below, I believe there is sufficient evidence to establish

a genuine issue of material fact on the issue of the DSM defendants' participation in a price-

fixing conspiracy even without having to draw negative inferences from the Crompton

executives' invocation of the Fifth Amendment privilege, I will reserve decision on the

admissibility of the adverse inferences until trial.  Accordingly, I will deny the motion to strike

the Fifth Amendment invocations of Joe Gatto, Daniel Shantz, James Conway, and Gerald

Fickenscher without prejudice to renewing that argument at trial.

3.      *European Commission Statement of Objections*

The defendants next contest the plaintiffs' reliance on a portion of a European

Commission Statement of Objections ("SO") regarding the EPDM industry.  PX 19.  The

plaintiffs concede that the information they cite from section four of the SO is hearsay, but assert

that it is admissible under the exception to the hearsay rule set forth in Federal Rule of Evidence

803(8)(C).

Rule 803(8)(C) provides:

> The following are not excluded by the hearsay rule, even though the declarant
> is available as a witness: . . . (8) Records, reports, statements, or data
> compilations, in any form, of public offices or agencies, setting forth . . . (C)
> in civil actions and proceedings . . . factual findings resulting from an
> investigation made pursuant to authority granted by law, unless the sources of
> information or other circumstances indicate lack of trustworthiness.

"Rule 803(8) 'is based upon the assumption that public officers will perform their duties, that

they lack motive to falsify, and that public inspection to which many such records are subject will

disclose inaccuracies.'" *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000) (quoting

31 Michael H. Graham, Federal Practice and Procedure § 6759, at 663-64 (interim ed. 1992)).

The admissibility of evidence covered under Rule 803(8)(C) "is generally favored" and

presumed.  *Gentile v. County of Suffolk*, 926 F.2d 142, 148 (2d Cir. 1991).  To be admissible

under Rule 803(8)(C), "the evidence must (1) contain factual findings, and (2) be based upon an

investigation made pursuant to legal authority."  *Bridgeway*, 201 F.3d at 143.  Once the party

seeking admission satisfies those "minimum requirements," the burden shifts to the party

opposing admission to demonstrate a lack of trustworthiness.  *Id.*

The DSM defendants do not dispute that the SO contains facts that are the result of an

-15-

investigation by a public agency made pursuant to authority granted by law.  Rather, the DSM

defendants dispute whether the "factual findings" are appropriately trustworthy, arguing that the

facts contained in section four of the SO are not reliable or trustworthy because they are not the

Commission's final findings of fact, but instead are provisional allegations that are subject to

further review by the Commission before any sanctions are levied.  The plaintiffs do not dispute

that the SO's facts are not established beyond dispute; they agree that parties can raise objections

to the facts contained in SOs by submitting a written reply detailing how and why the facts set

forth in the SO are not correct and that the Commission's ultimate decision can differ from the

facts presented in the SO.  But, notwithstanding the further opportunity to be heard on the facts

presented, the plaintiffs argue that the SO contains factual findings that are nonetheless

trustworthy and subject to the Rule 803(8)(C) hearsay exception.

Certainly, one factor when considering whether the factual findings contained in the

government agency's report are sufficiently trustworthy to warrant exclusion from the hearsay

rule under Rule 803(8)(C) is the finality of those findings.  *Coleman v. Home Depot, Inc.*, 306

F.3d 1333, 1342 n.4 (3d Cir. 2002).  Finality, however, is not the only factor to be considered.

Other pertinent factors for determining whether Rule 803(8)(C) applies include: "(a) the

timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a

hearing was held and the level at which it was conducted, and (d) possible motivation problems."

*Bridgeway*, 201 F.3d at 143 (citing Fed. R. Evid. 803(8)(C) advisory committee's note).  A court

may also consider the extent to which the findings are themselves based on inadmissible

evidence and, if so, whether appropriate safeguards were used to ensure the findings' reliability

and trustworthiness; whether the findings are based on an ascertainable record; whether the

findings represent the agency's policy judgment or are an implementation of the agency's policy

judgment; whether the findings are derived from prior factual findings that are untrustworthy;

and, if the report purports to offer an expert opinion, whether the opinion is derived from facts

and data of the sort reasonably relied upon by experts in that field.  *Coleman*, 306 F.3d at 1342

n.4 (citing *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 505 F. Supp. 1125, 1147 (E.D. Pa.

1980)).

   Contrary to the DSM defendants' position that a report must be "final" before it can be

considered sufficiently trustworthy for admission pursuant to Rule 803(8)(C), the plaintiffs have

cited to decisions in the Second Circuit and elsewhere that have admitted interim government

investigative reports into evidence.  *See, e.g.*, *Meriwether v. Coughlin*, 879 F.2d 1037, 1039 (2d

Cir. 1989) (noting that an interim report by the New York State Commission of Investigation on

corruption and abuses at a particular state prison had been admitted into evidence, and relying on

facts set forth in that interim report); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99cv1452 (JGK), 1999

WL 509471, at *3-4 (S.D.N.Y. July 19, 1999) (admitting Food and Drug Administration

("FDA") meeting minutes under Rule 803(8)(C) over objection of defendant that the minutes

contained non-final factual findings because the minutes "were the result of a timely review," the

FDA had authority to conduct the review, the investigators had "technical skill and expertise and

were unbiased," the defendant was given the opportunity to review the minutes and correct any

errors, and the defendant failed to otherwise demonstrate why or how the minutes were not

trustworthy); *Reynolds v. Giuliani*, No. 98cv8877 (WHP), 1999 WL 33027, at *1-2 (S.D.N.Y.

Jan. 21, 1999) (admitting draft report by the United States Department of Agriculture, over the

defendants' objections, under Rule 803(8)(C) after considering the relevant factors and noting

that "[t]he fact that the Report is non-final does not render it untrustworthy"); *Ellis v. Int'l Playtex, Inc.*, 745 F.2d 292, 300-02 (4th Cir. 1984) (admitting, under Rule 803(8)(C), government scientific reports containing "tentative conclusions as well as statistical findings" over defendant's objection that they were untrustworthy because they were not final findings of fact); *Jama v. INS*, 334 F. Supp. 2d 662, 677-81 & n.20 (D.N.J. 2004) (admitting interim INS investigatory report under Rule 803(8)(C) because the entity was itself responsible for the findings contained in the report and was not merely an informal staff report from within an entity charged with conducting the formal findings and noting that "the fact that findings are subject to review or revision, though it bears on their trustworthiness, does not remove them from the category of findings for the purposes of the rule"); *Wells v. Allstate Ins. Co.*, No. 00-0760-LFO, 2002 WL 34371516, at *2 (D.D.C. May 24, 2002) (admitting investigatory report under Rule 803(8)(C) that was not formally adopted by the relevant government body).

The fact that the SO is subject to further review and consideration by the Commission, therefore, is not necessarily dispositive on the question of trustworthiness. The DSM defendants rely on *City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir. 1981), which affirmed the district court's decision to exclude a report as failing to meet the requirements of Rule 803(8)(C), in part, because it was an "'interim' staff report in the form of a recommendation" to the agency administrator. Not only is the report at issue in *Pullman* distinguishable from the SO, but the Court's consideration of Rule 803(8)(C) included factors in addition to the lack of finality that weighed against admission under the hearsay exception. *Id.* First, the report in *Pullman* is more analogous to a draft SO, prepared by a staff member of the investigatory arm of the Commission and submitted to the SO's author, Neelie Kroes, for her approval, than to the final SO ultimately

-18-

authored and issued by Kroes, which the DSM defendants have moved to strike.  Second, the

*Pullman* Court also considered the report untrustworthy because it was not based on an

independent investigation by the report's author but relied on data from tests collected by the

parties themselves.  *Id.* at 915.  Finally, even the *Pullman* Court recognized that Rule 803(8)(C)

is to be "applied in a commonsense manner, subject to the district court's sound exercise of

discretion in determining whether the hearsay document offered in evidence has sufficient

independent indicia of reliability to justify its admission."  *Id.* at 914.

Pursuing their argument that the SO is untrustworthy, the DSM defendants cite the

decision by the Court of Justice of the European Communities (the "European Court of Justice"),

the EU's highest court, in Case C-413/06 P, *Bertelsmann v. Independent Music Publishers &*

*Labels Ass'n*, 2008 E.C.R. I-4951 (attached as Ex. F to the DSM Defs.' Supplemental Br.

Concerning Admissibility of the EC Statement of Objections), for the proposition that SOs have

no evidentiary value in the EU's own courts due to their lack of finality.  That proposition

mischaracterizes *Bertelsmann*'s holding.

*Bertelsmann* held that the Commission is not required to adhere to the SO's factual

findings, if, after considering the parties' objections to the SO and any new facts found during the

subsequent administrative proceedings, it issues a decision that makes factual findings

conflicting with those set forth in the SO.  *Id.* ¶¶ 61-77.  Describing the SO as "a procedural and

preparatory document" that "delimits the scope of the administrative procedure initiated by the

Commission," the *Bertelsmann* Court stated that the SO is inherently "provisional and subject to

amendments to be made by the Commission in its further assessment on the basis of the

observations submitted to it by the parties and subsequent findings of fact."  *Id.* ¶ 63.  The

-19-

*Bertelsmann* Court held that the lower court had erred when it (1) treated the SO's findings as being "established beyond dispute" and (2) vacated the Commission's subsequent decision because it contradicted the SO's factual findings.  *Id.* ¶ 76.  The *Bertelsmann* Court did not hold, however, that it is never appropriate for EU courts to consider an SO's factual findings.  In evaluating the "correctness, completeness and reliability of the facts on which a decision is based," the *Bertelsmann* Court stated that the courts are "not necessarily precluded from using the [SO] in order to interpret a decision of the Commission, particularly as regards the examination of its factual basis," notwithstanding the fact that SOs are "preparatory and provisional."  *Id.* ¶ 69.

Indeed, the plaintiffs point to at least two EU court decisions that treat the factual findings contained in SOs as meaningful and legitimate where those facts are not disputed by the target party in its written reply.  In Case T-410/03, *Hoechst GmbH v. Commission*, 2008 E.C.R. II-881 (attached as Ex. D to the Pl.'s Mem. Re: the Admissibility of Certain Factual Findings in the Statement of Objections), the Court of First Instance of the European Communities (the "Court of First Instance"), considered Hoechst's objection to the fine imposed for its participation in an anticompetitive scheme.   In the course of its ruling, the Court of First Instance summarized the parties' arguments regarding the factual grounds for the Commission's decision against Hoechst, stating that "the Commission contends that Hoechst obviously understood what is covered by the expression 'at a very high level' and that, moreover, the [SO] makes clear that the agreements had been conceived, directed and encouraged at a very high level in the undertakings concerned."  *Id.* ¶ 326.  The Court accepted the Commission's argument because "Hoescht did not dispute [the SO's] findings and there was no need to develop that point in greater detail."  *Id.*  The Court

further noted that, significantly, certain facts contained in the Commission's decision had been repeated from the facts set forth in the SO, which had never been objected to by Hoescht during the course of the subsequent administrative proceedings. *Id.* ¶¶ 354-56. *See also* Joined Cases T-236, 239, 244-46, 251, & 252/01, *Tokai Carbon Co. Ltd. v. Comm'n*, 2004 E.C.R. II-1181, ¶¶ 64-67 (attached as Ex. E to the Pl.'s Mem. Re: the Admissibility of Certain Factual Findings in the Statement of Objections) (rejecting an argument that relied on facts that contradicted the "findings of fact" made both in the Commission's decision and SO, where party expressly stated it did not seek to contradict the substantive truth of those facts); *id.* ¶¶ 70-74 (noting that the SO set forth facts that remained undisputed by the party in its reply to the SO).

The fact that the Commission is empowered to make subsequent factual findings that contradict the SO does not render the SO analogous to a complaint in an American lawsuit, i.e., a document containing mere factual allegations that the plaintiff must subsequently prove in order to prevail in his or her suit. The SO was not the opening salvo in the communications between the Commission and the target companies, but was the culmination of the Commission's preliminary investigation. Indeed, the SO indicates that DSM supplied at least four written replies to the Commission's requests for information. PX 19 at ¶ 59. SOs are properly understood as the Commission's investigatory body's factual findings and legal conclusions that are then submitted to the full Commission for its consideration; it is the Commission that has the authority to conclude that, based on the facts presented in the SO and through additional fact-finding arising out of the target party's written responses, the target parties violated the relevant EU competition laws. Decl. of Michel Petite ¶¶ 3-5 (attached as Ex. B to the DSM Defs.' Supplemental Br. Concerning Admissibility of the EC Statement of Objections). The

-21-

Commission is required to give the target party an opportunity to respond in writing, and to give

the party an opportunity to develop its arguments at an oral hearing, if the party so requests.  *Id.*

at ¶¶ 4-5; Commission Regulation 773/2004, 2004 O.J. (L 123) 18, 21.

        At least one district court in this circuit has held that an SO is eligible for admission

under Rule 803(8)(C).  In *Information Resources, Inc. v. The Dun & Bradstreet Corp.*, No.

96cv5716 (LLS), 1998 WL 851607 (S.D.N.Y. Dec. 8, 1998), the Court admitted the SO under

Rule 803(8)(C), despite the fact that it did not represent the final decision of the Commission,

because "[t]he circumstances do not indicate any lack of trustworthiness, and to the extent that

the [SO] represents conclusions, it is 'subject to the ultimate safeguard – the opponent's right to

present evidence tending to contradict or diminish the weight of those conclusions.'" *Id.* at *1

(quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 168 (1988)).  The DSM defendants argue

that the *Information Resources* Court misapplied the two cases it relied on in reaching its

decision to admit the SO: *In re Korean Air Lines Disaster of September 1, 1983*, 932 F.2d 1475,

1481-82 (D.C. Cir. 1991), and *In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d

238, 268 (3d Cir. 1983), *rev'd on other grounds sub nom. Matsushita Electric Industrial Co. v.

Zenith Radio Corp.*, 475 U.S. 574 (1986).  The DSM defendants contend that those cases do not

support the proposition that it is permissible to admit a non-final report.

        Contrary to the DSM defendants' assertion, however, those cases do not require a report

to be final in order to be admissible under Rule 803(8)(c).  In *Korean Air Lines*, the report was

"final" in the sense that it was last version completed by the Secretary General for the

International Civil Aviation Organization ("ICAO"), but it was prepared for the ICAO Council,

which had the authority to adopt or ignore the findings in the report.  932 F.2d at 1482.  Although

-22-

the Council ultimately chose not to endorse the report, the D.C. Circuit nevertheless concluded

that the report was trustworthy enough for admission under Rule 803(8)(C).  *Id.* at 1482-83.  In

*Japanese Electronics*, the Third Circuit determined that the district court had abused its

discretion when it concluded the government investigatory report's factual findings were

untrustworthy.  The district court made that determination because:

> (1) there was no evidentiary hearing; (2) the Assistant Secretary did not attend
> the hearings which were held but instead relied on staff reports; (3) the
> investigation included hearsay, confidential communications, and *ex parte*
> evidence; (4) the procedures, while permitting submissions and the
> opportunity to present argument by counsel, did not provide for
> cross-examination; (5) there was no ascertainable record; (6) the finding was
> made at a nascent stage of the investigation; (7) the finding was subject to
> some form of judicial review; and (8) the finding contained no statement of
> reasons for allowances or disallowances of particular adjustments.

723 F.2d at 268.  According to the Third Circuit, "[n]either singly nor collectively do these

reasons overcome the presumption of reliability."  *Id.*  On the issue of the stage of the

investigation, "[t]he fact that the finding was made at the nascent stage of the proceedings is in

our view of no significance."  *Id.*  Indeed, the report was a "predicate" for the agency to take

further proceedings.  *Id.*  The Court further noted that reliability was even more likely because

the parties had been represented by counsel during the investigation and had an opportunity to

submit written responses and make oral arguments.  *Id.*

        In total, neither case cited by the *Information Systems* Court required the report be final.

Consequently, I do not believe that the *Information Systems* Court relied on an improper reading

of those cases when it admitted an SO under Rule 803(8)(C).

        Although the DSM defendants point out that the Commission ultimately decided to close

the proceeding without finally adopting the SO's factual findings, Jt. Ex. 6, there is nothing in the

record to indicate whether DSM opted to formally object to the findings of fact contained in the SO. Many of the findings appear to be the product of cooperation between the Commission's investigatory body and DSM. For instance, the SO states that "DSM confirms the participation" of two DSM executives in a number of meetings at a particular hotel, but that it "was unable to provide any documents relating to these meetings." PX 19 ¶ 70. *See also id.* ¶ 85 ("DSM has confirmed the participation of two of its employees in such meetings . . ." and "DSM has confirmed that such contacts have taken place, and stated that no notes or agendas were kept of the meetings."); *id.* ¶ 89 ("[DSM's] De Roo for his part claims never to have known Gatto and never to have had dinner with Schmitt."); *id.* ¶ 125 ("[DSM's] Viets confirms that he has met [Bayer's] Bach from time to time, but cannot recall a meeting where both [Bayer's] Pask and Bach were present. He states that there was no agenda or minutes kept for these informal meetings.").

Based on the EU court decisions discussed above, where there is no indication that a party expressly disputed the factual findings contained in the SO, it is appropriate for the Commission to consider the factual findings in the SO on that point to be dispositive of the issue. In other words, there is nothing that prevents the Commission from relying on the SO's factual findings absent some showing of error by the parties. DSM has not submitted any document that indicates whether it submitted written objections to the SO's facts. Without such objections, there would be no reason, based on the thoroughness of the investigation, for the Commission to disbelieve the SO's factual findings.

Furthermore the SO's factual findings can be verified by comparison with other evidence in the record. For instance, paragraph 112 of the SO describes a meeting between DSM's Viets,

-24-

Bayer's Pask, and Enichem's Cantoni and indicates that the three "discussed their assessments of total demand of a number of large customers." PX 19.  In his deposition, Viets admits to meeting with those two other men in early 1998 in Germany, as the SO relates.  Viets Dep., PD 13 at 70.  Viets's handwritten notes from that meeting state that the three men discussed the price of EPDM and common customers.[8]  PX 108; Viets Dep., PD 13 at 88-89, 102-17.

An SO's factual findings are not the ultimate, immutable factual findings of the Commission, but are rather the final report by the investigatory body of the Commission that initiates the full Commission's consideration of the conduct set forth in the SO.  With respect to the SO at issue here, the Commission ultimately decided to drop the proceedings initiated by the SO.  Except for those points, the DSM defendants have not set forth any grounds why the SO should be considered untrustworthy.  I conclude that the factual findings in the SO are sufficiently trustworthy to warrant exclusion from the hearsay rule under Rule 803(8)(C) because (1) the SO at issue here was in *its* final form, i.e., the plaintiffs are not attempting to submit a draft SO; (2) the SO is the product of an independent investigation, during which DSM was given the opportunity to participate by submitting at least four written responses prior to the report's publication; (3) there is no indication that the report was not completed in a timely manner; (4) the report was based on a record of ascertainable and verifiable facts; (5) there is no indication that the DSM defendants objected to the SO's factual findings, despite the opportunity to do so; and (6) the report was authored by the EC Commissioner for Competition, Neelie Kroes, the highest Commission official directly responsible for antitrust matters, whom the DSM

---

[8] Those notes are the subject of another evidentiary challenge by the DSM defendants.  As discussed more fully in that section of my ruling, I decline to exclude those notes on the ground of irrelevance.

defendants have not accused of having questionable motives or bias in producing the SO.

Accordingly, I deny the motion to strike PX 19, the European Commission's Statement of Objections addressed, in part, to DSM. The DSM defendants have not challenged the relevance of the SO, nor have they made an argument that its potential prejudice substantially outweighs its probativeness. My ruling, therefore, does not address those issues, and the defendants remain free to raise those and any other evidentiary challenges to the document at trial.

4.      *Foreign Evidence*

The DSM defendants next move to strike particular evidentiary documents regarding foreign conduct as irrelevant, including: (1) PX 55: an email written by Bernard Schmitt on August 14, 1996; (2) PX 108: Viets's handwritten notes authored on April 17, 1998; (3) Jt. Ex. 110: a memo authored by Gatto on July 14, 1998; and (4) PX 53 & PX 233: emails authored by Schmitt on July 24, 1996 and December 7, 2000.[9] The plaintiffs contend that the EPDM price-fixing scheme was globalized and, therefore, foreign conspiratorial conduct is relevant to the defendants' price-fixing activities in the United States. Specifically, the plaintiffs contend that conduct in Europe is important for understanding the U.S. price-fixing scheme because EPDM manufacturers set U.S. prices in consideration of European prices to avoid the potential for arbitrage and the defendants' North American and European counterparts met to discuss EPDM pricing and customers in both markets.

I will address the relevance of each challenged piece of evidence in turn.

_____

[9] The DSM defendants call this the "July 12, 2000 email," but the plaintiffs state the email refers to a December 7, 2000 meeting in Germany. The email is dated "07/12/2000." PX 233. Because it is the European style to put the day before the month, and considering the nature of its subject matter, it is more likely that this email was actually sent on December 7, 2000.

a.      August 14, 1996 Schmitt Email

Plaintiffs contend that the challenged email authored by Crompton's Bernard Schmitt is a summary of the meeting he had with DSM's Peter De Roo in Maastrict, Netherlands on or about August 14, 1996.  According to the email and Schmitt's handwritten notes, PX 56, and as confirmed by Schmitt in his deposition, PD 10, Schmitt Dep. at 61, not only did he meet De Roo on that date in Maastricht, but they discussed DSM personnel changes in the United States, DSM's worldwide capacity, which includes the United States, and the probability that DSM would announce a price increase for that October.  For his part, De Roo agrees that he met with Schmitt three or four times, but asserts that they merely exchanged simple greetings and discussed "common things."  PD 17, De Roo Dep. at 25.  De Roo denies ever discussing future price increases of EPDM with Schmitt.  *Id.* at 26.

Because De Roo denies that any of his meetings with Schmitt strayed beyond simple greetings and common things, the email from Schmitt to his bosses at Crompton is probative of whether De Roo and Schmitt ever discussed future EPDM price increases.  Because the email suggests the two men also discussed issues relating to the U.S. market and DSM's U.S. personnel, it is relevant to the issue of a price-fixing conspiracy that affected the U.S. EPDM market.

The DSM defendants have not offered any specific reasons why this email would be prejudicial.  It is not clear on its face how it would be any more prejudicial to the DSM defendants than many of the other pieces of evidence submitted in connection with the motion for summary judgment.  Accordingly, although I conclude that the August 14, 2006 Schmitt email is relevant to the plaintiffs' antitrust case, I reserve judgment on the issue whether the

email will actually be admitted at trial.  The DSM defendants are free to raise objections other than relevance then.

                            b.        Viets's Handwritten Notes Dated April 17, 1998

The plaintiffs contend that DSM's Nicholas Viets's handwritten notes dated April 17, 1998, PX 108, are the informal minutes from a meeting he had at the Arabella Hotel in Düsseldorf, Germany with Bayer's Pask and Enichem's Cantoni.  In his deposition, Viets identified the note as having been written during that meeting.  He also decoded the note, stating that it refers to EPDM grades, EPDM prices, and common European customers.  PD 13, Viets Dep. at 88-90, 102-17.  Viets' expense report indicates he had expenses at the Arabella Hotel, but does not indicate what the purpose of the visit was.  PX 106.  In addition, the Arabella Hotel bill is made out to a "Herrn Weissmann," at DEE's corporate address in the Netherlands.  *Id.*  No one by that name attended the meeting and, indeed, no one with that name was employed at DEE at that time.  PD 14, Nederstigt Dep. at 147.  The expense report for Pask indicates he traveled to Düsseldorf, but does not mention a business purpose for the trip.  PX 107.

The plaintiffs contend that Viets's handwritten notes are relevant to the topics of discussion for the meeting at the Arabella Hotel meeting on April 17, 1998.  Although Viets admits that he went to the meeting, he has no independent recollection of what occurred at that meeting.  PD 13, Viets Dep. at 105, 110-11.  It is unclear how the discussion summarized in Viets's note involved anything that could have had an effect on the U.S. EPDM market, but it is at least probative of the fact that high level executives were comfortable meeting with one another to share otherwise sensitive company information, such as customers and pricing.  The plaintiffs would like the jury to draw an inference from that meeting that the defendants were

engaged in collusive activity.  The notes are probative of that issue because they help establish a

fact from which the jury could infer that the EPDM executives were engaged in something other

than legitimate business discussions.  In the absence of the notes, the jury would be left to

speculate about untoward activity on the basis of the assumed name on the hotel bill.  Under the

plaintiffs' theory about the defendants' collusive conduct, the notes are relevant to the issue

whether there was an atmosphere of cooperation in Europe that ultimately led to price-fixing in

the U.S. market.  Accordingly, I decline to strike this evidence as irrelevant at the summary

judgment stage, and will reserve judgment on its ultimate admissibility until trial.

c.      Gatto Memo Dated July 14, 1998

According to the plaintiffs, the memorandum sent to Crompton's Daniel Shantz from

Crompton's Joe Gatto memorializes a meeting that Gatto and his Crompton colleague Gerald

Fickenscher had with U.S. and European DSM representatives, Paul Hamm and Wim Donners,

in Heerlen, Netherlands on July 13, 1998.  Jt. Ex. 110.  The memo relates that the parties

discussed competitors' strategies, DSM's profitability, DSM's worldwide expansion plans,

DSM's research and development, worldwide market share, and that "Donners indicated DSM

will be looking to raise Europe prices in Q4."  *Id.*  The parties agreed to meet again that October

in London.  *Id.*  At his deposition, DSM's Donners stated he had no memory of that meeting "at

all."  PD 18, Donners Dep. at 122.  Gatto and Fickenscher both asserted their Fifth Amendment

privilege when asked about the meeting and refused to testify about it.  Jt. Ex. 103, Gatto Dep. at

110; Fickenscher Dep., Jt. Ex. 111 at 29-34.

Gatto's memo appears to be the only record evidence of what occurred at that July 13,

1998 meeting between Crompton and DSM executives.  Therefore, it is relevant to establish what

-29-

topics were discussed and to show that the defendant executives had a consistent, working relationship in which they discussed expansion plans, EPDM prices, and research and development issues, and the like. With the proper foundation at trial, this document is potentially relevant to the question of the nature of the relationships that formed the basis of the price-fixing conspiracy. The DSM defendants have also not advanced a specific reason why this particular memo is prejudicial to them. Accordingly, I decline to strike this memo as irrelevant at this stage of the proceedings; the parties remain free to argue their positions at trial.

            d.      Schmitt Emails dated July 24, 1996 and December 7, 2000

The plaintiffs seek to introduce the Schmitt emails dated July 24, 1996 and December 7, 2000, PX 53 and PX 233, to prove that executives for the settling defendants met and discussed things such as European EPDM price increases, worldwide capacity, and "pricing issues" in the U.S. market. Both emails contain the direction to destroy the email after receipt. For the same reasons discussed above, I decline to conclude that these emails are irrelevant to the plaintiff's case. I will address any specific arguments related to prejudice or other evidentiary issues that the DSM defendants wish to raise if and when the plaintiffs seek to introduce those emails at trial.

            e.      Conclusion on the Admissibility of the Foreign Evidence

The plaintiffs contend that the foreign evidence goes to establishing the existence of a global conspiracy that involved, in part, a price-fixing scheme for the U.S. EPDM market. The DSM defendants would have me exclude that evidence on the theory that evidence of foreign conduct can never be relevant to a price-fixing scheme to affect the price of U.S. EPDM. I decline to adopt such a bright-line rule. Furthermore, the case cited by the DSM defendants, *In*

*re Elevator Antitrust Litigation*, 502 F.3d 47, 51-52 (2d Cir. 2007) (per curiam), does not support across-the-board exclusion of the challenged foreign evidence in this case.  In *Elevator*, the Second Circuit determined that the plaintiffs had failed to establish a plausible allegation of a U.S. price-fixing scheme on the basis of evidence that European authorities had initiated an investigation into a price-fixing scheme of the European elevator market.  *Id.* at 51-52.  The plaintiffs sought to connect Italian Antitrust Authority and European Commission investigations to the existence of an antitrust conspiracy in the U.S. elevator market, arguing that the market in elevators was global and that prices charged in Europe affected prices in the U.S.  *Id.* at 51 & n.6.  The Second Circuit held that that allegation was not plausible because the plaintiffs had failed to sufficiently allege how the U.S. elevator market and the European elevator market were connected.  *Id.* at 52.  For instance, the *Elevator* Court noted that there were "no allegations of global marketing or fungible products;" no allegations "that participants monitored prices in other markets;" and "no allegations of the actual pricing of elevators or maintenance services in the United States or changes therein attributable to defendants' alleged misconduct."  *Id.*  In the absence of any "allegations of facts linking transactions in Europe to transactions and effects here," the plaintiffs' antitrust claims failed to survive the motion to dismiss plausibility standard of review.  *Id.*

Here, the challenged foreign evidence the plaintiffs seek to use at trial does contain those elements whose omission was of concern to the Second Circuit in *Elevator*.  Taken in the light most favorable to the plaintiffs at the summary judgment stage, the record would support jury findings that EPDM is a fungible product, the participants of the alleged conspiracy monitored prices in other markets, and the price changes in the U.S. were affected by European prices.  In

-31-

other words, the evidence supports the finding that the European and U.S. EPDM markets are

connected.  Accordingly, the DSM defendants' reliance on *Elevator* to exclude the foreign

evidence is misplaced.

For the time being, it does not appear that the plaintiffs are seeking to admit the foreign

evidence to prove the existence of a separate European EPDM conspiracy in order to argue that

the existence of a European conspiracy makes it more likely that the defendants engaged in a

U.S. EPDM conspiracy.  At trial, if it appears that that is the purpose for which the evidence is

being offered, the defendants remain free to argue that the plaintiffs are seeking to use the foreign

evidence for an improper purpose under Federal Rule of Evidence 404(b).  Until then, I decline

to exclude the foreign evidence on that basis.  Accordingly, the motion to strike the foreign

evidence is denied.

### 5. *Joe Gatto's Handwritten Notes*

Finally, the DSM defendants seek to exclude Joe Gatto's handwritten notes appearing on

eight different documents: PX 61, PX 89, Jt. Ex. 95, PX 83, Jt. Ex. 102, PX 99, PX 118, and PX

235.  The DSM defendants argue that plaintiffs have failed to properly authenticate the

handwritten notes pursuant to Federal Rule of Evidence 901(a), which requires "evidence

sufficient to support a finding that the matter in question is what its proponent claims."

According to the DSM defendants, it is not enough for a Crompton representative to identify the

handwriting as Gatto's.  The DSM defendants argue that, even if they conceded that Gatto wrote

the notes, the plaintiffs have nevertheless failed to put forward sufficient evidence to support a

finding that the notes accurately reflect what the plaintiffs are claiming.  The plaintiffs contend

that the notes have been sufficiently authenticated as Gatto's by a record custodian from

Crompton and because they were produced from Crompton's own files during discovery.  They do not address the DSM defendants' argument that further authentication is necessary and instead contend that the notes are admissible under at least three exceptions to the hearsay rule.

Because the European Commission Statement of Objections and the Crompton interrogatory answers serve to establish the same facts that plaintiffs seek to establish through the Gatto handwritten notes, I need not address the admissibility of those notes at this juncture, and will wait to take up the evidentiary issues at the appropriate time during trial.

Briefly, however, on the issue of the authentication, Federal Rule of Evidence 901(a) requires that the proponent demonstrate, for purposes of admissibility, that there is "evidence sufficient to support a finding that the matter in question is what the proponent claims."  The plaintiffs claim the notes are contemporaneous notes taken by Gatto during his meetings with his alleged co-conspirators.  The DSM defendants do not dispute, for purposes of their motion to strike, that the handwriting is Gatto's.  It appears that the plaintiffs have set forth sufficient evidence to show that the handwritten notes were made in connection with meetings that Gatto had with other defendants' executives, i.e., the notes are what the plaintiffs claim they are. Between the SO, the Crompton interrogatories, expense reports, and other memoranda memorializing that a meeting occurred at the time and place that the notes suggest, I find there is sufficient evidence to authenticate the handwritten notes as Joe Gatto's taken down in connection with meetings he had with the defendants' executives.  Whether the information conveyed in those notes is admissible requires a separate analysis of the relevant hearsay exceptions, which I will take up at the appropriate time.

6.      *Conclusion on Motion to Strike*

For the foregoing reasons, the motions to strike are denied in their entirety.  Evidentiary

issues not addressed conclusively in this ruling may be raised again at the appropriate time at

trial.

## III.    **Motion for Summary Judgment**

The DSM defendants move for summary judgment on the ground that the plaintiffs have

failed to put forth any evidence that would give rise to a genuine issue of material fact on the

question of the DSM defendants' participation in a conspiracy to fix, raise, maintain, or stabilize

EPDM prices in the United States.  The DSM defendants argue that the plaintiffs' evidence, at

best, demonstrates "consciously parallel" behavior between the defendants in this case, which, in

the absence of any agreement, they maintain is not a violation of the antitrust laws.  The DSM

defendants argue that summary judgment is warranted because (1) the plaintiffs have failed to

present any evidence of industry-wide meetings or a series of systematic contacts between

representatives of all six defendants linked to the six list price announcements; (2) there could be

no agreement among the defendants to limit their capacity to produce EPDM because there is

evidence that the DSM defendants' plans to build new plants were formulated during the Class

Period; (3) the plaintiffs have failed to present evidence that the defendants agreed to allocate

markets or refrain from competing for each other's customers, which would overcome the

significant evidence of competitive behavior among the defendants during the Class Period; and

(4) there is an economically reasonable explanation for the price increases during the Class

Period, namely, that output was reaching capacity, demand was increasing, and the cost of the

major inputs for EPDM were rising.  The plaintiffs counter that they have submitted sufficient

evidence from which a reasonable jury could find that the DSM defendants actively participated

in a conspiracy to fix prices of EPDM in the United States, limit competition among the

defendants, limit supply, allocate markets, and otherwise engage in anticompetitive behavior in

violation of antitrust laws.

      A.     <u>Standard of Review</u>

          1.    *General Summary Judgment Standard*

Summary judgment is appropriate when the evidence demonstrates that "there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)

(plaintiff must present affirmative evidence in order to defeat a properly supported motion for

summary judgment).

When ruling on a summary judgment motion, the court must construe the facts in the

light most favorable to the nonmoving party and must resolve all ambiguities and draw all

reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 158-59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d

Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party"). When a motion for summary judgment is properly supported by

documentary and testimonial evidence, however, the nonmoving party may not rest upon the

mere allegations or denials of his pleadings, but must present significant probative evidence to

establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted.  *Anderson*, 477 U.S. at 249-50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.  As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247-48.  To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party."  *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary judgment may enter.  *Celotex*, 477 U.S. at 323.

2.      *Antitrust Summary Judgment Standard*

The plaintiffs allege that the DSM defendants have violated section one of the Sherman Act, which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."  15 U.S.C. § 1. Specifically, the plaintiffs have alleged that the defendants engaged in a horizontal price-fixing scheme in which the defendants agreed to raise or maintain prices for EPDM at supracompetitive levels.

Horizontal price-fixing schemes are considered *per se* violations of the Sherman Act. *Catalano, Inc. v. Target Sales, Inc.*,  446 U.S. 643, 647 (1980) (per curiam).  In order to prove a horizontal price-fixing scheme, a plaintiff must demonstrate: "(1) the existence of an agreement, combination or conspiracy, (2) among actual competitors, (3) with the purpose or effect of 'raising, depressing, fixing, pegging, or stabilizing the price of a commodity,' (4) in interstate or foreign commerce."  *In re Medical X-Ray Film Antitrust Litig.*, 946 F. Supp. 209, 215-16 (E.D.N.Y. 1996) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 (1940)).  The crucial and only contested issue for this motion for summary judgment is the first element: whether the plaintiffs have produced sufficient evidence for a reasonable jury to find that the defendants had an actual, manifest agreement to participate in a price-fixing conspiracy to affect the U.S. EPDM market, and that the DSM defendants were members of that conspiracy.

Although the Sherman Act's language is arguably broad enough to include a "purely tacit agreement to fix prices," most courts agree "that an express, manifested agreement, and thus an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act."  *In re High Fructose Corn Syrup*

*Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002).  To prove the existence of an express, manifested agreement, the antitrust plaintiff should present "direct or circumstantial evidence that reasonably tends to prove that the manufacturer and others had a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation omitted).  *See also Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987) (holding that, "at a minimum," a jury must be able to conclude that "the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement" (quotation omitted)).  In the absence of direct evidence of a price-fixing agreement, i.e., "an admission by the defendants that they agreed to fix their prices," the plaintiffs may present circumstantial evidence from which the existence of "an explicit, manifested agreement" to fix EPDM prices may be inferred.  *High Fructose Corn Syrup*, 295 F.3d at 654-55.  One such form of circumstantial evidence is the defendants' parallel conduct – namely, the six lockstep EPDM price increases.  App. A to the Class Pls.' Mem. of Law in Opp'n to Mots. for Summ. J.

But "the Supreme Court has stated that 'antitrust law limits the range of permissible inferences from ambiguous evidence" in a horizontal price-fixing case.  *Apex Oil*, 822 F.2d at 252 (quoting *Matsushita*, 475 U.S. at 588).  Circumstantial evidence of  "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of conspiracy."  *Matsushita*, 475 U.S. at 588.  It is undisputed that the six lockstep price increases are strong circumstantial evidence of an illegal agreement to raise and/or maintain EPDM prices.  In an oligopolistic market, however, "conscious parallelism" or "tacit collusion" to raise or maintain prices is not *per se* unlawful because it could be the result of permissible,

independent parallel conduct. *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509

U.S. 209, 227 (1993).

Therefore, in addition to submitting evidence of parallel price increases, the plaintiffs

must establish certain so-called "plus" factors, "which, when viewed in conjunction with the

parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil*, 822 F.2d at 253.

The most relevant plus factors include: (1) a motive to conspire, which can be evidence that the

industry is susceptible to price-fixing; (2) noncompetitive behavior, i.e., evidence that the

defendants acted contrary to their economic self-interest; and (3) evidence of a traditional

conspiracy, such as a high level of interfirm communications that would suggest that the

defendants consciously agreed not to compete. *E.g.*, *id.* at 253-54; *In re Flat Glass Antitrust*

*Litig.*, 385 F.3d 350, 360 (3d Cir. 2004).

Establishing an antitrust case on the basis of circumstantial evidence necessarily means

that the evidence produced in conjunction with the plus factors is susceptible to differing

inferences – the inference that, on the one hand, the defendants were engaged in illegally

collusive behavior or that, on the other hand, they were merely engaged in lawful, independent

parallel conduct.  Thus, the issue at summary judgment often involves a determination of

whether the plaintiff has gone far enough to dispel the inference that the defendants acted

permissibly.

To do so, a plaintiff seeking to defeat a motion for summary judgment in a "section one"

antitrust case "must present evidence that 'tends to exclude the possibility' that the alleged

conspirators acted independently." *Matsushita*, 475 U.S. at 88 (quoting *Monsanto*, 465 U.S. at

764).  Here, the parties essentially dispute the meaning of the standard "tends to exclude the

possibility" that the defendants acted permissibly.  Based on the arguments set forth in their briefs and the representations of counsel at the oral argument, the DSM defendants appear to contend that the plaintiffs' evidence has not absolutely excluded the possibility that they were engaged in independent, permissible conduct and, therefore, summary judgment is appropriate. The DSM defendants, however, have overstated the plaintiff's burden at the summary judgment stage by misconstruing the Supreme Court's direction in *Matsushita* that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  475 U.S. at 588.  For each piece of evidence that the plaintiffs presented that would support an inference of illegal conduct, the DSM defendants have advanced a plausible explanation that supports an inference of permissible conduct and argued that, because the plaintiffs did not refute that explanation completely, summary judgment is appropriate.  If the plaintiffs' evidence proved so conclusively that the DSM defendants were not engaged in permissible acts, however, then there would be no need for a jury and the *plaintiffs* would be entitled to summary judgment.  The plaintiffs, however, are not seeking summary judgment, and acknowledge that their evidence gives rise to competing inferences.

Subsequent courts that have analyzed *Matsushita*'s antitrust summary judgment standard have not adopted the DSM defendants' position that, where the plaintiff has put forward evidence that establishes a plausible inference of illegal collusive behavior, summary judgment is nevertheless appropriate if it does not absolutely or even strongly outweigh the defendants' legitimate explanation.  To adopt the defendants' position would permit the courts to stand in the stead of the fact-finder at trial by weighing competing inferences and determining which party has established the "better" explanation.  According to the Supreme Court, however, "*Matsushita*

-40-

. . . did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases."

*Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 468 (1992).

Fundamentally, "tends to exclude" does not mean "excludes." *Matsushita* requires only

that, construing the plaintiff's evidence in the light most favorable to it as the nonmoving party, a

reasonable fact-finder could find that the defendants could not have also been engaging in

independent, permissible conduct. As *Eastman Kodak* explained,

> [T]he [*Matsushita*] Court did not hold that if the moving party enunciates *any*
> economic theory supporting its behavior, regardless of its accuracy in
> reflecting the actual market, it is entitled to summary judgment.
> *Matsushita* demands only that the nonmoving party's inferences be
> reasonable in order to reach the jury, a requirement that was not invented, but
> merely articulated, in that decision. If the plaintiff's theory is economically
> senseless, no reasonable jury could find in its favor, and summary judgment
> should be granted.

*Id.* at 468-69 (emphasis in original) (footnote omitted). Where the plaintiff's theory is

"plausible," on the other hand, then the task of weighing "competing permissible inferences

remains within the province of the fact-finder at a trial." *Apex Oil*, 822 F.2d at 253. Although

"summary judgment is a valuable means for avoiding unnecessary trials . . . it should not be

regarded as a substitute for trial." *Id.* at 252. At most, the court's role in examining the factual

inferences at the summary judgment stage is limited to determining whether the parties have

drawn "reasonable and therefore permissible," inferences from the evidence presented. *Id.* at

253.

The DSM defendants' arguments in favor of summary judgment are precisely the "traps"

that Judge Richard Posner, writing in *High Fructose Corn Syrup*, cautioned that courts must

avoid when examining motions for summary judgment in price-fixing suits. 295 F.3d at 655.

Specifically, when determining whether the plaintiffs' evidence sufficiently defeats summary judgment, courts should not weigh conflicting evidence, because that is the job of the jury; attach great significance to the lack of a single piece of evidence that unequivocally demonstrates a conspiracy; or "fail[] to distinguish between the existence of a conspiracy and its efficacy." *Id.* at 655-56. As Judge Posner notes, evidence that is "susceptible of differing interpretations" is not "devoid of probative value" for the nonmoving party, and it is the role of the jury to determine "whether, when the evidence [is] considered as a whole, it [is] more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices." *Id.*

B.    The Plaintiffs' Case at Summary Judgment

The plaintiffs assert that they have successfully established an inference of antitrust conspiracy that is sufficient to survive the defendants' motion for summary judgment under the applicable standard. Specifically, the plaintiffs argue that they have successfully demonstrated that, in addition to the six lockstep price increases during the class period (the parallel conduct), the EPDM market was particularly susceptible to illegal collusion, the DSM defendants acted against their economic self-interest by helping to supply a competitor with product at below-market prices rather than sell that product on the open market, and the DSM defendants' executives engaged in a high level of suspicious inter-firm communications (the plus factors). The plaintiffs contend that the parallel conduct, in combination with the plus factors, raises an inference that the defendants were actively conspiring to raise and/or maintain EPDM prices at supracompetitive levels in violation of section one of the Sherman Act.

The DSM defendants seek summary judgment primarily on the ground that there is a lack of evidence pointing to an explicit agreement among the EPDM suppliers to keep EPDM prices

-42-

at supracompetitive levels.  Specifically, they argue that the first two plus factors do not tend to exclude the possibility of independent conduct, and that the communications unearthed by the plaintiffs in discovery are merely informal communications that do not unambiguously support an inference of conspiracy and do not correlate to the claimed specific collusive behavior.

### 1.    *Parallel Conduct: Six Lockstep EPDM List Price Increases*

The DSM defendants do not dispute that there were six lockstep price increases during the class period, but adamantly maintain that those price increases are merely evidence of permissible, independent parallel acts that are to be expected in oligopolies.[10]  DCI – DSM's U.S. affiliate – participated in each of the six list price increases, and led price increases twice.  App. A to the Class Pls.' Mem. of Law in Opp'n to Mots. for Summ. J.  On November 25, 1998, it announced it would be raising its prices $0.05 for clear polymers EPDM, with the other five alleged co-conspirators following suit by the end of December 1998.  *Id.*  On May 15, 2000, DCI again announced it would be raising its list price for clear polymers EPDM by $0.06; the other five alleged co-conspirators followed suit with a $0.06 or $0.05 increase by the end of June 2000. *Id.*

### 2.    *Plus Factors*

#### a.    Motive to Conspire: EPDM's Industry Characteristics Make Illegal Collusion Feasible

The plaintiffs next assert that they have established without dispute that the EPDM

---

[10] They further note that lockstep pricing also occurred outside the alleged class period (i.e., beginning with the August 1997 price increase).  The latter point is a red herring, however, because the plaintiffs are not alleging that the conspiracy began in 1997 and *no earlier*.  Instead, they are seeking damages from 1997 through the end of 2001, but maintain that there was a conspiracy in place even before the class period.

market was susceptible to an antitrust conspiracy because it is a highly concentrated oligopoly that would make secret price-fixing feasible.  The DSM defendants contend that market structure is not probative of whether the six alleged co-conspirator defendants were engaged in an illegal antitrust conspiracy because there are many highly concentrated industries that produce commodity-like products.

The EPDM market has many characteristics that would make illegal collusion feasible: (1) EPDM's commodity-like nature; (2) the lack of economic substitutes; (3) the product's price inelastic demand; (4) defendants' dominance of the highly-concentrated market; (5) the barriers to market entry; and (6) defendants' use of national (as opposed to regional) price lists and price increase announcements.  *Cf. High Fructose Corn Syrup*, 295 F.3d at 656-58 (noting that the high fructose corn syrup market exhibited those characteristics, which in turn indicated that the structure of the market made secret price fixing feasible).  Significantly, the DSM defendants do not dispute the basic characteristics of the EPDM market,[11] which provide the basis for establishing the possible motive for illegal collusion.   Rather, the DSM defendants dispute only the accuracy of the plaintiffs' characterizations of (1) certain specifications about the industry, (2) the defendants' market share, and (3) capacity utilization figures.

The defendants are correct to note that this plus factor is less probative of antitrust conspiracy than other factors.  *See Flat Glass*, 385 F.3d at 361 (stating that "[t]he most important evidence" will not be the defendants' motive to conspire but "non-economic evidence that there was an actual, manifest agreement not to compete" (internal quotation omitted)).  The "motive to

---

[11] A more detailed discussion of the EPDM's industry characteristics is set forth in my ruling on the plaintiffs' motion for class certification.  *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 256 F.R.D. 82, 91-95 (D. Conn. 2009).

conspire" plus factor  – i.e., that the characteristics of the EPDM market make collusion feasible, thus establishing a motive to conspire – is a restatement of the "theory of interdependence" identified in *Flat Glass*: "firms in a concentrated market may maintain their prices at supracompetitive levels, or even raise them to those levels, without engaging in any overt concerted action." *Id.* at 359.  The theory of interdependence essentially posits that, in an oligopoly – a market dominated by few firms – any one firm's decision to change output or price will be noticeable to the other firms in the market.  Therefore, before making such a decision, firms in those markets will naturally take into account the anticipated reaction of their rival firms and it is not unusual to engage in permissible conduct that resembles illegal collusion (a/k/a "conscious parallelism").  *Id.* (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1429, at 207 (2d ed. 2000)).  But even if evidence of this plus factor may not, by itself, be sufficient to defeat the DSM defendants' motion for summary judgment, it is a basis for inferring the existence of a horizontal price-fixing agreement, especially when introduced in conjunction with evidence supporting the other two plus factors.  *Id.* at 361 & n.12.

          b.        DSM Acts Against Economic Self-Interest

The plaintiffs have presented evidence that the DSM defendants acted against their economic self-interest by selling EPDM at a sub-market price to Exxon when Exxon was having supply issues, rather than simply selling the EPDM to Exxon's customers at higher market prices.  Thus, DSM *could* have supplied the Exxon customers directly for higher profit, rather than selling to Exxon at a price below market level.  The parties dispute what inferences can be drawn from that decision.

The plaintiffs assert that the DSM defendants' agreement with Exxon to sell EPDM at

below-market rates to Exxon, a competing EPDM producer, is evidence of the plus factor acting against economic self-interest.  The DSM defendants insist that it made a rational (and still-profitable) business decision to sell to Exxon and that the plaintiffs are engaging in impermissible speculation that it was "irrational" for DSM to agree to the deal.  The DSM defendants assert that, because the decision was still a profit-making venture, the plaintiffs and this court should not second-guess its business judgment.

The facts are as follows.  In October and November 1999, according to documents presented by the plaintiffs, DSM and Exxon executives engaged in a series of negotiations for a DSM-Exxon supply agreement.  As Exxon's Jim McKinley explained in an internal memo, Exxon was seeking a three-year supply agreement with DSM due to "great strain . . . being placed on Exxon's ability to supply EP(D)M to meet [its] customer needs."  Jt. Ex. 135.  According to McKinley, the price offered by DSM had to be a certain amount less than market price in order to be "competitive in the marketplace."  *Id.*  Responding to hesitation from a least one DSM employee who "question[ed] . . . the financial attractiveness of the deal" to supply EPDM to Exxon at below-market prices, DSM's Lincoln Widmer wrote an email explaining that it "should be viewed as both strategic (basis to grow relationship with Exxon) and as a means to secure incremental volume at no risk to market."  PX 148.  Widmer noted that the low "[f]inancial attractiveness of the deal is well understood and indeed the decision to move forward was very difficult for my group even after much discussion and analysis."  *Id.*  His "bottom line" was that capturing an additional margin of $1.1 million/year at minimal risk outweighed the risk of venturing into the market to compete for Exxon's customers.  *Id.*  The deal was consummated in January 2000, whereby Exxon pledged to purchase a minimum of 1000 metric tons ("MT") of

DSM EPDM product (Keltan 5508) each year for three years.  PX 182.  DSM agreed to supply

up to 1600 MT per year at a base price of $0.81 per pound ($1,785.73 per MT), to be adjusted

according to market price increases.  *Id.*

In August 2000, a DSM sales manager alerted Widmer that Exxon appeared to be selling

the DSM product to a DSM customer, who had begun purchasing less product from DSM itself.

PX 214.  Representatives from the two companies met soon thereafter to discuss DSM's

concerns that one of its customers was purchasing DSM EPDM from Exxon.  PX 217, 218.  The

unofficial notes of the meeting indicate that DSM cautioned the Exxon employees that reselling

the DSM product to DSM customers "was not [the] original intent" of the contract and was "not

a win/win situation."  PX 218.  Jim McKinley of Exxon, "promised to remedy" the problem.  *Id.*

The "official" minutes of the meeting delete that information, which could give rise to an

inference that the two companies were unlawfully allocating market share.  PX 219.

The plaintiffs contend that, construing the facts in the light most favorable to them, a

reasonable jury could infer from this episode that the Exxon supply agreement was against the

DSM defendants' economic self-interest and was actually consummated in order to shore up the

cartel's market share distributions.  In effect, DSM agreed to forgo the potential for higher profits

by selling its product on the open market, perhaps directly to Exxon customers, in order to permit

Exxon to maintain its customer base.  As noted by the minutes from the August 2000 meeting,

DSM did not expect (and Exxon promised to remedy) that Exxon would undercut DSM with

DSM's product by re-selling the DSM EPDM to DSM customers at a lower price.

The DSM defendants contend that there is a rational business reason for engaging in the

contract: to build a strategic relationship with Exxon, which was a longstanding customer of

DSM, and to limit the risk of selling EPDM on the open market.  To defeat the plaintiffs'

argument that DSM acted against its self-interest, the defendants contend that, because the deal

was "profitable," it was a rational business decision that this Court is not permitted to second-

guess.  According to the DSM defendants, by citing a rational business reason for its behavior,

the burden shifts back to the plaintiffs to demonstrate that the DSM defendants were not engaged

in conduct that is consistent with proper business practice.

In support of this proposition, the DSM defendants cite to *In re Citric Acid Antitrust

Litigation*, 191 F.3d 1090, 1101 (9th Cir. 1999), and *Blomkest Fertilizer, Inc. v. Potash Corp. of

Saskatchewan*, 203 F.3d 1028, 1037 (8th Cir. 2000).  DSM contends those decisions support its

position that courts must not second-guess facially reasonable business judgments, even those

subject to reasonable dispute.  Because the cited decisions do not support the DSM defendants'

position, I do not find their argument persuasive.

In *Citric Acid*, the defendant conceded the existence of an antitrust conspiracy in the citric

acid market, but denied any participation of its own in that conspiracy.  191 F.3d at 1093.  The

plaintiff was attempting to connect the defendant to the conspiracy using circumstantial evidence,

including the argument that the defendant had failed to expand its production capacity more

rapidly than it could have, and thus, had acted against its economic self-interest.  *Id.* at 1100.

The Ninth Circuit declined to draw an inference that the defendant was involved in the

conspiracy from the fact that it could have expanded more quickly where, in fact, the defendant

had actually doubled capacity in a few years.  *Id.* at 1101.  According to the Ninth Circuit,

because firms have broad discretion to make business judgments, they "should not be second-

guessed even where the evidence concerning the rationality of the challenged activities might be

-48-

subject to reasonable dispute." *Id.*

In seeking to draw an analogy to this case, the DSM defendants miss a significant distinguishing point. The *Citric Acid* Court rejected drawing an inference that the defendants were acting contrary to economic self-interest on the ground that they "could have" done something *more* to further their economic interest. Here, in contrast, the plaintiffs contend that the DSM defendants were actually engaged in conduct that harmed their economic self-interest. The plaintiffs are not merely suggesting that the DSM defendants failed to compete aggressively enough for their competitors' customers or refused to increase production capacity despite being able to do so. Rather, the plaintiffs maintain that the DSM defendants' agreed to help their competitors by selling EPDM to Exxon at below-market prices. Such evidence permits a reasonable jury to conclude that the DSM defendants were engaged in behavior that was contrary to their economic self-interest. Indeed, it would fit the type of behavior that *High Fructose Corn Syrup* suggests "is a way of shoring up a sellers' cartel by protecting the market share of each seller." 295 F.3d at 659.

Next, it is true that the *Blomkest* Court stated that "where there is an independent business justification for the defendants's [sic] behavior, no inference of conspiracy can be drawn." 203 F.3d at 1037. The DSM defendants, however, are wrong to suggest that they need only come up with *any* business rationale for the contract with Exxon to avoid an inference of illegal collusion from acting against one's economic self-interest. In *Blomkest*, the plaintiffs claimed that the defendants' failure to object to an agreement between the industry and the U.S. Department of Commerce, which set a price floor for the commodity product at issue, was against their economic self-interest. *Id.* The Eighth Circuit held that the plaintiffs had failed to carry their

burden of explaining how not objecting to the agreement was against the defendants' economic self-interest, particularly considering that it resulted in higher prices for the defendants and helped to avoid costly litigation. *Id.* The Court was not weighing the inferences and then *rejecting* the inference drawn by the plaintiffs merely because the defendants offered an independent business justification for the decision; the *Blomkest* plaintiffs simply never offered a plausible explanation for how an adverse inference could be drawn from the decision not to object to an agreement that was actually in the defendants' economic self-interest. *Id.*

Here, by contrast, the plaintiffs have supported with documentary evidence an inference of collusive behavior from an act against economic self-interest. From that act, a reasonable jury could infer that the DSM defendants entered the agreement as part of an illegal conspiracy to apportion market share. The defendants do not avoid the inference merely by offering an independent business justification; instead, the DSM defendants' justification shifts the burden back to make a showing, that "if successful, might tend to exclude the possibility" of collusion. *Apex Oil*, 822 F.2d at 254. Again, the *Matsushita* standard does not require that the plaintiffs *eliminate* the possibility that the DSM defendants were not acting collusively. Construing the facts in the light most favorable to the plaintiff, as courts must do at summary judgment, the plaintiffs' evidence of DSM's agreement with Exxon "tends to exclude the possibility" that there was an innocent explanation for the DSM defendants' behavior, despite their proffered legitimate business justification. A reasonable jury could infer that the DSM defendants' acts were contrary to their economic interests and were indicative of a conspiracy to allocate the EPDM market and fix prices at supracompetitive levels.

Finally, it is worth noting that the "acting against self interest" plus factor is not as

probative of an antitrust conspiracy as the third factor, which is "non-economic evidence that there was an actual, manifest agreement not to compete." *Flat Glass*, 385 F.3d at 361 (internal quotation omitted).  As the *Flat Glass* Court explained, acting contrary to self-interest is neither a necessary nor sufficient factor to preclude summary judgment, but it is relevant evidence that a court should nevertheless consider.  *Id.* at 361 & n.12.

c.  Evidence of a Traditional Conspiracy

Without doubt, the key plus factor at summary judgment is the plaintiffs' evidence of an actual, manifest agreement, i.e., evidence that includes "'customary indications of traditional conspiracy,' or 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'"  *Id.* at 361 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 1434b, at 243).  The plaintiffs have submitted documents memorializing meetings and discussions about prices and capacity issues they contend give rise to an inference of illegal collusion.  Those documents indicate that the defendants were extremely chummy and treated each other more like colleagues than traditional competitors, and that the defendants' executives often communicated immediately before or after an EPDM price increase.  The documents also indicate an active effort to conceal those meetings.  The plaintiffs argue that, together, the documents are sufficient circumstantial evidence to establish the third plus factor, evidence of a traditional conspiracy.

The plaintiffs begin with the level of "chumminess" among executives of the EPDM suppliers, which they argue sets the stage for the price-fixing conspiracy by making it easier for the EPDM executives to engage in collusive activity.  Indeed, whether competing executives

-51-

view one another as friends and colleagues first, and competitors second, is a factor in determining the plausibility of the conspiracy's mechanics.  *E.g.*, *High Fructose Corn Syrup*, 295 F.3d at 662.  For example, Crompton's Gatto went to college with DSM's Lacallade and was the best man at Lacallade's wedding.  PD 10, Lacallade Dep. at 74-79.  Their wives continue to maintain a social relationship.  *Id.* at 75, 77.  Despite this longstanding friendship, Lacallade testified that he has never discussed this litigation with Gatto.  *Id.* at 76.  In addition, Lacallade claimed Crompton's Shantz as a friend of 35 years.  *Id.* at 247.  DSM's Steady testified that he had been friends with Shantz for approximately 20 years.

In a memo to his bosses dated July 7, 2000, DSM's Steve Nathanson stated that he and Jim Conway of Crompton "talk every week" and had "developed a good working relationship." PX 206.  In that memo, Nathanson stated that Conway had "revealed" "confidential" information to him about Crompton's relationship with other EPDM suppliers, including DDE, Exxon, Bayer, and "all industry players."  *Id.*

In an interview, DSM's Hamm described the executives at other EPDM suppliers as his "colleagues" and stated that he felt "that is the way it ought to be."  PX 145.  He went on to state that "co-operation with our colleagues," meaning his competitors at other EPDM suppliers, "is key for us."  *Id.*

The plaintiffs next contend that the large number of meetings between EPDM executives, held in offsite locations, i.e., not their traditional places of business, further indicates an intention to hide or disguise their actions.  The plaintiffs have set forth evidence that DSM executives met with other EPDM executives between 1994 and 2002 in the following locations: the Arabella Hotel in Düsseldorf, Germany; the Russian Tea Room in New York City; the bar at the Sheraton

Airport Hotel in Brussels, Belgium; a coffee shop in Baton Rouge, Louisiana; a conference in

Rio de Janiero, Brazil; the Grand Ole Opry in Nashville, Tennessee, and a restaurant by the

Rhine River in Germany.

      The plaintiffs argue that the defendants' efforts to conceal their meetings and the

communications memorializing the topics of discussion at those meetings give rise to an

inference that the meetings involved illicit conduct.  For instance, at least once, a DSM executive

registered for a conference room where he met with executives from two other EPDM suppliers

under a false name.  PD 13, Viets Dep. at 70; PX 106, 107.  In addition, the plaintiffs included

emails between the alleged conspirators that contained the language: "eliminate from email," PX

53, and  "Pls destroy e-mail after reading," PX 233.

      Finally, pointing to a plethora of emails, memoranda, and other inter-firm

communications, the plaintiffs argue that the topics addressed at those meetings – price increases,

prices, customers, and capacity – further support their claim that the DSM defendants were

involved in an actual agreement to fix prices of EPDM in the U.S. market.

      The plaintiffs have laid out a comprehensive narrative, linking the evidence together to

create a time line of the alleged conspiratorial activity over the course of nearly a decade.  The

following are representative examples of those communications:

> (1)    In a May 7, 1999 memo aimed at prepping his boss for an industry
> conference, DSM's Nathanson summarized the following talking
> points that DSM's Hamm should raise with the other EPDM
> executives at the meeting.  Jt. Ex. 152.  Bayer: "What are you doing? .
> . . Price in North America is going up they are taking it down.  They
> are acting totally undisciplined.  They will become target of [DSM] in
> North America if they continue."  UCC: "They have been disciplined .
> . . .  Congratulate them on a professional approach."   Uniroyal:
> "Thank them for their support of us on 1/1/99 price increase.  Tell

them we are trying to avoid any conflict with them." *Id.*

(2)   Crompton's interrogatory responses state that, on October 20, 1999, Crompton's Shantz met with DSM's Lacallade at a coffee shop in Baton Rouge.  Jt. Ex. 94 at 28.  "They discussed North American pricing.  Lacallade stated that DSM would not lead a price increase because they had led in the past and suffered as a result." *Id.*

(3)   In an email to DSM's Viets, Hamm, and other DSM employees, dated November 11, 1999, DSM's Widmer relates the pricing situation in North America, noting that "DDE has become highly aggressive" and that such "undisciplined behavior" was requiring Exxon and DSM to "protect strategic regional accounts."  PX13 (emphasis in original).  He further states that "[u]nlike Exxon, Uniroyal and DSM, Bayer remains highly undisciplined in implementing pricing policy in the Americas." *Id.* (emphasis in original).  Looking forward, he recommended that DSM "[c]ontinue developing climate for a general price in N.A." *Id.*

(4)   In an email from DSM's Widmer to DSM's Lacallade and Nathanson, dated April 13, 2000, entitled "Further EPDM Price Increases – North America," Widmer recommends "a general market announcement in North America no later than May 1, 2000," and notes that there are "strong indications that the EPDM industry will quickly support this action."  PX 195.

(5)   In an August 10, 2000 email to DSM's Widmer, DSM's Lacallade wrote: "This price is exactly and merely competitive with [Crompton], as we didn't want to cause [Crompton] (the most loyal supporter of the price increase . . . ) to think we weren't supporting [sic] the increase."  PX 211 (ellipsis in original).  In his deposition testimony, Lacallade stated that he would tell his sales people that "I don't want to buy business, especially from [Crompton]," meaning he did not want to undercut Crompton's prices.  PD 10, Lacallade Dep. at 149-50.  He further explained that "[i]n the time of the price increase, even though I might do different things in terms of implementing the price increase at different accounts, we want to appear to our competitors as being by the book implementing whatever the price increase said because that's what we wanted them to do." *Id.* at 151.

(6)   According to Crompton's interrogatory responses, Crompton's Gatto met with DSM's Nathanson and Widmer at a Baton Rouge coffee shop on November 7, 2000 where they discussed "the marketplace,"

with both sides "lament[ing] the poor condition of the market and express[ing] the need for an increase." Jt. Ex. 94 at 35. "Both sides believed that customers would resist attempts to increase prices and that an increase would not be possible during the next year." *Id.* at 35-36.

(7)     In preparation for a meeting with a Bayer executive, on July 6, 2001, DSM's Widmer sent DSM's Ben van Kooten a list of possible questions he could ask, including "[w]hy do they continue to 'trash' the N. American EPDM market with undisciplined pricing?" PX 258.

(8)     In an email dated July 27, 2001, DSM's Nathanson debriefed DSM's van Kooten about his meeting with Crompton. Jt. Ex. 157. According to that email, Crompton related to Nathanson that they were "[o]n board that prices need to go up" and that Crompton "agrees that grabing [sic] more share from each other is not the way." *Id.* Nathanson wrote that Crompton was "[a]fraid to take any price initiatives," but that they "[w]ill watch us and Exxon and follow price as has been their history.  Customers mad at them for leading last price increase." *Id.*

The DSM defendants counter that, in putting forward this evidence of a traditional conspiracy, the plaintiffs are substituting quantity for quality.  They argue that the plaintiffs are trying to obscure the fact that none of the documents demonstrates conclusively that the defendants made an agreement to engage in a price-fixing scheme to keep EPDM prices at supracompetitive levels.  According to the DSM defendants, the circumstantial evidence consists mainly of isolated communications that do not support an inference that the DSM defendants "agreed" with any EPDM supplier on future pricing, let alone demonstrate that there was a manifested, actual agreement to participate in an industry-wide cartel aimed at keeping prices at supracompetitive levels and stifling competition for market share.

The DSM defendants' primary argument is one of the "traps" identified by Judge Posner in *High Fructose Corn Syrup*: that courts should avoid requiring plaintiffs to put forward

evidence that unequivocally points to conspiracy.  295 F.3d at 655.  Rather than following the

DSM defendants' suggestion that summary judgment is appropriate because the plaintiffs have

failed to produce a document that unambiguously demonstrates the existence of an actual

agreement to engage in illegal collusion, I will apply the standard set forth in *High Fructose*

*Corn Syrup*: "whether, when the evidence [is] considered as a whole, it [is] more likely that the

defendants had conspired to fix prices than that they had not conspired to fix prices."  *Id.*

Here, the plaintiffs' evidence of the frequent and friendly communications between the

defendants and the secrecy of their meetings is sufficient to allow a reasonable jury to infer that

the defendants participated in an unlawful price-fixing conspiracy.  The plaintiffs' evidence

shows that the defendants' executives engaged in friendly and frequent communications with

each other, during which they discussed issues such as the price of EPDM and market shares.

Furthermore, the executives discussed how their companies would respond to price increases,

whether their companies would be willing to lead a price increase, and whether their competitors

were "disciplined" and could be expected to maintain prices or follow a price increase.  And

there is evidence that the executives attempted to conceal those communications by holding

meetings offsite or by requesting that written messages be destroyed after reading.  Together, the

plaintiffs' evidence would permit a fact-finder to conclude that the defendants engaged in more

than mere conscious parallelism or tacit collusion.  Rather, by showing that the defendants shared

pricing and market information and indicated to each other whether they would lead or support

price increases, the plaintiffs have created an issue of fact that the defendants participated in a

traditional conspiracy to fix prices and allocate the American EPDM market.

Undoubtedly, there may be an innocent explanation and full defense to the plaintiffs'

proof of those communications.  But the fact that no document definitively proves the

conspiracy's existence does not mean that the motion for summary judgment must be granted.  In

another antitrust opinion involving the production of millions of documents from which the

plaintiffs had "plucked a number of tasty morsels," Judge Posner, again writing for the Seventh

Circuit, noted that those "smoking gun" documents created a record that supported the inference

that representatives of the defendant companies urged collusive, lockstep anticompetitive actions.

*In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 614 (7th Cir. 1997).  The

Seventh Circuit reminded the defendants that the issue was not whether they *in fact* participated

in an illegal price-fixing scheme, but rather whether there was sufficient evidence to create an

issue for the fact-finder.  *Id.*  The *Brand Name Prescription Drugs* Court cautioned that "[t]he

defendants' interpretations may be correct; they are not inevitable."  *Id.*

The plaintiffs' section one claim survives because the sum of the plaintiffs' evidence

permits a fact-finder to conclude that, more likely than not, the defendants entered a traditional

conspiracy to fix the prices of EPDM in violation of section one of the Sherman Act.  The DSM

defendants' arguments may ultimately persuade a jury that no conspiracy ever existed.  But the

plaintiffs have submitted enough evidence of a traditional conspiracy to create an issue for a fact-

finder.  That is enough for to establish the third plus factor at summary judgment.

The DSM defendants offer a second argument that the plaintiffs have failed to establish a

traditional conspiracy because they offer no evidence that anyone from Exxon, a significant

supplier in the American EPDM market, communicated or met with any of the other

conspirators.  According to the DSM defendants, that absence of evidence of friendly or frequent

communications between Exxon and the other alleged co-conspirators means that Exxon has not

been proven to be a conspirator.  From that proposition, they reason the plaintiffs' claim of a

conspiracy between the other defendants must fail because it is implausible that DSM – or, for

that matter, any of the other defendants – would have entered into an agreement to allocate and

fix prices in the American EPDM market without the participation of a supplier who had the

capacity to undercut the alleged cartel's prices and disrupt the agreement.

     The DSM defendants' argument is unsound, however, because the plaintiffs have

introduced evidence that would permit a fact-finder to conclude that Exxon participated in the

agreement to allocate market share and fix prices in the American EPDM market.  As discussed

above, there is evidence that DSM and Exxon entered into an agreement in which DSM would

supply EPDM to Exxon at sub-market rates, Jt. Ex. 135, with the understanding that Exxon

would not sell EPDM to DSM's customers, PX 218.  In other words, there is evidence from

which a reasonable jury could infer that, as a condition of DSM's offer to supply EPDM, Exxon

agreed to allocate shares of the American EPDM market.

     In addition, there is circumstantial evidence showing that Exxon participated in the

lockstep price increases with the other defendants.  Specifically, there is evidence that Exxon

executives met with representatives of Crompton and DSM in October 1999, Jt. Ex. 94, PX 164,

where, during at least the Crompton meeting, EPDM pricing was discussed, PD 11, Schmitt Dep.

178-80.  After those meetings, DSM executives communicated internally that DSM would

"immediately support Exxon" if it led a price increase.  PX 13.  Exxon then raised the price of

EPDM on November 30, 1999, which all of the other defendants then followed.  Indeed, there is

documentation that an executive of DDE communicated that his company would "support" the

Exxon-led EPDM price increase to a Crompton executive a week before DDE informed its

-58-

customers of its plans.  Jt. Ex. 94 at 28.  Although the proof of Exxon's agreement to fix prices

may not be as strong as the evidence that it agreed to allocate the American EPDM market with

DSM, the plaintiffs have put forward enough evidence for a jury to infer that Exxon conspired to

maintain and/or raise prices with its competitors.

      Alternatively, even if there were not enough evidence to support the plaintiffs' claim that

Exxon conspired with the other defendants to fix prices, the DSM defendants would still not be

entitled to summary judgment.  Exxon's participation may make the plaintiffs' claims of a price-

fixing agreement more probable – but it does not follow that Exxon's participation in the scheme

is essential to the plaintiffs' case.  On the contrary, the other EPDM producers could have agreed

with each other to follow Exxon's expected leads in price increases and not undercut Exxon or

each other, or the EPDM producers could have entered their agreement on the assumption that

Exxon would follow their price increases.  *See* Reply Report of Keith Leffler ¶¶ 13-16,

Supplemental App. B to Pls. Parker Hannifin Corp.'s and Polyone Corp.'s Mem. Of Law in

Opp'n to Mot. for Summ. J. (responding to DSM defendants' expert's economic argument that

no cartel could have existed without Exxon's participation).  That theory is sufficiently plausible,

especially when considered with whole of the documentary, non-economic evidence of a

traditional conspiracy between the remaining defendants, for the plaintiffs to overcome the DSM

defendants' motion for summary judgment.  Therefore, the plaintiffs have marshaled enough

evidence of a traditional conspiracy, even if Exxon were excepted, for a jury to infer that the

DSM defendants and other suppliers of the American EPDM market engaged in more than

permissible conscious parallelism or tacit collusion.

C.   <u>Conclusion on Summary Judgment Motion</u>

The plaintiffs have presented enough evidence of meetings or discussions about price increases for EPDM and capacity issues in the North American market between supposed competitors that a reasonable fact-finder could conclude that the defendants were engaged in illegally collusive behavior, and that, more specifically, the DSM defendants were active participant in that conspiracy.  It is true that there is no one document that unequivocally demonstrates the existence of an actual, manifest agreement to conspire.  A reasonable jury, however, could easily infer from the evidence presented that the defendants, including the DSM defendants, conspired to fix prices in the U.S. EPDM market.  The DSM defendants are correct to note that there is a potentially innocent explanation for each piece of evidence.  As Judge Posner in *High Fructose Corn Syrup* concluded, however, what matters at the summary judgment stage is whether the plaintiffs' interpretations are sufficient to create an issue of material fact, not whether they are correct.

Based on the evidence of parallel conduct, in addition to the evidence submitted in support of the three plus factors, I conclude that the plaintiffs have successfully raised a genuine issue of material fact whether the DSM defendants were active participants in a price-fixing scheme in the U.S. EPDM market.  If the defendants were meeting in secret to discuss the specifics of price increases (such as when they would occur, how much the price should go up, who would lead the price increase) and arranging to limit competition for each other's customers, those facts would tend to exclude the possibility that the lockstep price increases were the result of lawful conscious parallelism alone.  In other words, considering the evidence as a whole and construing it in the light most favorable to the plaintiffs, a reasonable jury could find it more

likely that the DSM defendants conspired to fix prices than that they did not conspire to fix prices.  Accordingly, the motions for summary judgment must be denied.

**IV.    Conclusion**

For the forgoing reasons, the motions for summary judgment (**3:03md1542: doc. #437**) and (**3:05md1642: doc. #320**) are **DENIED**.   The motions to strike (**3:03md1542: docs**. **#472**, **#476**, and **#480**) (**3:05md1642: docs. #343, #349, and #352**) are **DENIED** in their entirety.

It is so ordered.

Dated at Bridgeport, Connecticut, this 29th day of December 2009.

_____
                    /s/
                    Stefan R. Underhill
                    United States District Judge